```
UNITED STATES DISTRICT COURT            (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
JACOBA CORNELISSE,                 :    09 Civ. 5049 (JCF)
                                   :
             Plaintiff,            :       OPINION
                                   :     AND ORDER
    - against -                    :
                                   :
THE UNITED STATES OF AMERICA, its  :
agency and/or entity THE           :
SMITHSONIAN INSTITUTION, its       :
agents, servants, and/or employees,:
and the COOPER-HEWITT NATIONAL     :
MUSEUM, its agents, servants,      :
and/or employees,                  :
                                   :
             Defendants.           :
- - - - - - - - - - - - - - - - - -:
```

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

The plaintiff, Jacoba Cornelisse, tripped and injured her knee while attending an exhibition at the Cooper-Hewitt Museum, a branch of the Smithsonian Institution in Manhattan. She subsequently commenced this action seeking damages under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671-2679. The parties consented to proceed before me for all purposes pursuant to 28 U.S.C. § 636(c), and a bench trial on the issue of liability was held from December 12-14, 2012. This opinion constitutes my findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

The Evidence

The Cooper-Hewitt is the national design museum and is located

in a historic mansion originally built for Andrew Carnegie.  (Tr. at 341).[1]  From September 2007 to January 2008, it housed an exhibit entitled "Provoking Magic: The Lighting of Ingo Maurer." (Tr. at 111, 360-61).  Mr. Maurer is a German lighting designer, and the exhibit consisted of light installations created by Mr. Maurer, including two transparent benches filled with hundreds of light-emitting diode ("LED") bulbs.  (Tr. at 111-12, 365; Pl. Exh. 2, 11).[2]  The benches were displayed in Gallery 118, an alcove beneath the grand staircase in the Great Hall.  (Tr. at 112-14, 383-84).  They were situated on a temporary floor or platform covered with a reflective metal laminate, facing a television screen where a video played continuously.  (Tr. at 112, 366).  This area of the exhibit also included a title wall as well as a chandelier that Mr. Maurer had covered with a sheer red fabric and supplemented with additional bulbs.  (Tr. at 112, 366).

Ms. Cornelisse attended the Ingo Maurer exhibit on November 19, 2007.  (Tr. at 185).  As she was approaching the television screen and the benches, she kicked something with her right foot and stumbled forward; although she did not fall to the ground, she heard a crack in her left knee as she put weight on her left foot to brace herself.  (Tr. at 186-87, 193-94).  She then sat on one of

---

[1] "Tr." refers to the trial transcript.

[2] "Exh." refers to exhibits received in evidence at trial.

the benches with her husband, Salah Ait Oukdim, for five or ten minutes watching the video before going upstairs to view additional exhibits. (Tr. at 187-90). When they returned to the first floor, Ms. Cornelisse reported her accident to members of the museum staff. (Tr. at 189-91). The staff called for medical assistance, and Ms. Cornelisse was removed to a hospital by ambulance. (Tr. at 164, 191).

At trial, the plaintiff testified that the temporary flooring on which the benches were located was three to four centimeters higher than the permanent floor on which it had been constructed. (Tr. at 189). Ms. Cornelisse also stated that there was no strip lighting to designate a change in level and no warning sign. (Tr. at 187).

Mr. Oukdim also testified at trial. Although he did not see his wife stumble (Tr. at 160), he did observe the vicinity where the accident occurred. He stated that the benches were located in a dark area (Tr. at 166) and that the temporary flooring was made of a transparent material like the benches (Tr. at 177). At trial Mr. Oukdim testified that the platform was raised three or three and one-half centimeters (Tr. at 162), though at his deposition he had estimated that it was two inches high (Tr. at 177-80). He never returned to the museum to take measurements. (Tr. at 180).

The plaintiff's daughter, Hadda Conde, visited the Cooper-

3

Hewitt a day or two after the accident and took photographs of the area around the benches.  (Tr. at 151-52; Pl. Exh. 11).  According to Ms. Conde, she used a digital "point and shoot" camera with an automatic flash.  (Tr. at 154-55).  At trial, the only sources of light she remembered seeing were the benches and the television screen, and she did not recall the chandelier.  (Tr. at 155-56).  She did not measure the height of the flooring.  (Tr. at 158-59).

Tracy Lynch, a security guard at the museum, was called as a witness by the plaintiff.  (Tr. at 27-28).  He testified that he had estimated the platform to be about two inches high (Tr. at 25, 53), though he never measured it (Tr. at 42).  He also stated that the lighting in the area of the benches was adequate, as he indicated when he wrote a report of the plaintiff's accident.  (Tr. at 38-39; Gov't Exh. A).

The plaintiff's expert witness at trial was Dr. William Marletta, a safety consultant with a doctorate in safety and health from New York University.  (Tr. at 213-14).  Dr. Marletta testified that the Smithsonian's own rules, as well as the Americans with Disabilities Act requirements and American National Standards Institute ("ANSI") standard A-117 set forth requirements for the transition between surface levels.  (Tr. at 224).  For a change in level of less than 1/4 inch, no transition is required. (Tr. at 224).  Where the differerence is between 1/4 and 1/2 inch,

the top quarter inch must be beveled with a rise-to-run ratio of one-to-two.[3] (Tr. at 224). For changes greater than 1/2 inch, the transition must be ramped, with a rise-to-run ratio of one-to-ten or one-to-twelve. (Tr. at 224).

Based in part on the testimony of other witnesses, Dr. Marletta concluded that the platform at issue did not meet these requirements. (Tr. at 224-25). He also examined a photograph of the exhibit, and inferred from certain visual cues that the change in level was greater than one inch. (Tr. at 225-26). For example, he compared the apparent change in level to the relative height of a stair tread, to the thickness of the LED benches, and to the size of an electric socket, all depicted in the photo. (Tr. at 226-27). Given what Dr. Marletta estimated the height of the transition to be, he testified that it should have been ramped, and it was not. (Tr. at 228-30).

Dr. Marletta was also of the opinion that because the change in height was not properly transitioned, it was necessary to provide some visual warning. (Tr. at 231). This could have been

---

[3] Dr. Marletta referred to the slope of this beveling as a 45-degree angle (Tr. at 224), and the defendants' expert characterized it the same way. (Tr. at 444). This is not correct. A rise-to-run ratio of one-to-one would be a 45-degree angle, while a ratio of one-to-two is approximately 26.57 degrees. (www.csgnetwork.com/righttricalc.html, last visited March 20, 2012). This error is not significant, however, since the parties agree on the appropriate rise-to-run ratio.

accomplished by marking the change in level with contrasting colors; however, the floor and the edge of the platform were both dark wood. (Tr. at 92-93, 228-32, 267). Alternatively, some type of warning sign might have been posted, but none was. (Tr. at 231-32).

Finally, Dr. Marletta testified that the lighting conditions in the vicinity of the platform did not conform to accepted safety practices. (Tr. at 233). In reaching this conclusion, he relied on testimony of witnesses who characterized the area as dark as well as on his review of the photograph taken by Ms. Cornelisse's daughter. (Tr. at 233-34). He also took light meter readings on March 30, 2011, and found illumination ranging from 0.1 to 0.3 foot candles in the rear of the area up to 4.9 foot candles in the front. (Tr. at 234-36). According to Dr. Marletta, safe conditions would have required 5.0 foot candles of illumination. (Tr. at 237-39). However, when he took his measurements, the Ingo Maurer exhibit had been taken down and replaced by an exhibit that was illuminated differently. (Tr. at 235 & Exh. Z).

The defendants' first witness, Janice Slivko, is the Smithsonian's construction manager/architect responsible for its properties in New York City, including the Cooper-Hewitt. (Tr. at 335-36, 339-40). She acknowledged that the Smithsonian's safety and accessibility guidelines for a change in level are equivalent

6

to the ADA guidelines; for a change of between 1/4 and 1/2 inch, the lower 1/4 inch may be vertical, but the upper 1/4 inch must be beveled with a rise-to-run of one-to-two. (Tr. at 354). Consistent with the Smithsonian's standard operating procedure, Ms. Slivko reviewed the plans for the Ingo Maurer exhibit and forwarded them to the appropriate personnel, including the accessibility coordinator and an engineer with the Office of Safety and Emergency Management, for further review. (Tr. at 357-63; Exhs. E, F, G, H). The plans contained flooring elevations (Tr. at 366-69; Exh. Q), and were reviewed for public safety concerns, among other things. (Tr. at 365). Those plans called for the flooring under the LED benches to be constructed of a "linoleum type product" over half inch MDF, which is the acronym for multi density fiber board. (Tr. at 367, 388). The top 1/4 inch of the edge was to be beveled with a one-to-two slope. (Tr. at 368; Exh. Q). Ms. Slivko participated in between six and twelve walk-throughs of the exhibit before it opened to the public, and she observed that the flooring under the LED benches appeared to conform to the plans. (Tr. at 370-71, 375-76). In addition, when the engineer from the Office of Safety and Emergency Management participated in an inspection and identified safety issues that needed to be addressed, he did not identify the flooring as a hazard. (Tr. at 372-74; Exh. G).

The defendants also presented the testimony of Matthew

7

O'Connor, the production manager for the exhibition department at the Cooper-Hewitt. (Tr. at 380-81). Mr. O'Connor was responsible for supervising the construction of the flooring and other elements of the Ingo Maurer exhibit. (Tr. at 382). In doing so, he relied on the blueprints that had been subjected to the Smithsonian review process. (Tr. at 385; Exh. Q). According to those plans, the total height of the platform was to be 1.3 centimeters, which is considered the metric equivalent of 1/2 inch, though, in fact it is 0.51 inches. (Tr. at 387). The beveled edge was to begin 0.4 centimeters, or a little less than 3/16 of an inch from the level of the permanent floor and then rise in a one-to-two slope to the top of the temporary platform. (Tr. at 392; Exh. Q). The MDF was to be covered by an aluminum laminate, silver in color, affixed with an adhesive. (Tr. at 388-89). According to Mr. O'Connor, the flooring was constructed in compliance with the plans. (Tr. at 391-92, 394-96). He is certain that the MDF was the standard 1/2 inch, since material of perhaps 3/4 of an inch in thickness would have been significantly heavier, and the difference would have been clearly visible. (Tr. at 391-92). However, Mr. O'Connor acknowledged that the plans called for a total height of 1/2 inch, and that the laminate had a thickness of 0.02 inches. (Tr. at 421-22). Nevertheless, he testified that the flooring as built was to specification because MDF is generally undersized -- that is, the

8

fact that the MDF was in fact less than 1/2 inch thick compensated for the thickness of the laminate. (Tr. at 419-23, 433). Mr. O'Connor also verified the height of the flooring by observing a photograph of the exhibit. He noted that the title wall of the exhibit was constructed with a 1/2 inch "reveal": a space between the front edge of the wall and the floor. (Tr. at 386-87, 411; Exh. Q, details 6, 7). In the photograph, the edge of the reveal appears to be flush with the top of the temporary flooring. (Tr. at 412-13; Exh. 9).

In addition to testifying about the platform, Mr. O'Connor described the lighting at the Ingo Maurer show. Above the exhibit was a historic chandelier that Mr. Maurer had covered with a red gauze-like fabric. (Tr. at 399-400). More than 20 small light bulbs called lucellinoes were attached to the outside of the fixture. (Tr. at 399). Under the stairwell at the rear of the exhibit were five track lights designed to light a wide area. (Tr. at 400-01). In addition, each of the two transparent benches contained 280 LED lights, and there was ambient light from the television screen, from sconces next to the adjacent elevators, and from an adjoining gallery. (Tr. at 402-04).

The defendants also presented the testimony of an expert witness, Dr. Steven Rosen, a consultant in accidents involving falls. (Tr. at 434). Dr. Rosen concluded that the platform at

issue was not a tripping hazard, even if, as built, it did not precisely conform to the plans. (Tr. at 443). He stated:

> My opinion is that if it was built this way, even if it was a millimeter or two higher than this, this would be a safe configuration, not a tripping hazard. In fact, someone should be able to walk across this in virtually total darkness and still not have an accident.

(Tr. at 443). Dr. Rosen also testified that, based on the representation of another witness that there was enough light to read a newspaper in the exhibit, there was at least one foot candle of illumination and that this would be adequate to see small changes in elevation. (Tr. at 450-52). He further noted that it would be meaningless to take light meter readings in an exhibition that was illuminated differently than the Ingo Maurer exhibit. (Tr. at 452-55).

I will refer to additional facts as they are relevant to the legal analysis.

Discussion

    A. Legal Framework

In adjudicating tort claims under the FTCA, a court must apply the "law of the place where the act or omission occurred," including its choice of law principles. 28 U.S.C. § 1346(b)(1); see Richards v. United States, 369 U.S. 1, 11-13 (1962); Guthrie v. US Federal Bureau of Prisons, No. 09 Civ. 990, 2010 WL 2836155, at *4 n.5 (S.D.N.Y. July 7, 2010); Duffy v. United States, 49 F.

10

Supp. 2d 658, 659-60 (S.D.N.Y. 1999).  Here, the allegedly tortious conduct took place in New York, and, under New York choice of law principles, the locus of the tort generally provides the substantive law in cases involving conduct-regulating law.  See Krock v. Lipsay, 97 F.3d 640, 646 (2d Cir. 1996).  Since the issue here -- the Smithsonian's potential liability for accidents occurring on its premises -- relates to the regulation of conduct, New York substantive law applies.

In order to establish a prima facie case of negligence under New York law, a plaintiff must demonstrate that the defendants owed her a duty of care, that they breached that duty, and that she suffered an injury proximately caused by the breach.  Solomon v. City of New York, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 392 (1985), accord Skyline Travel, Inc. (NJ) v. Emirates, No. 09 Civ. 8007, 2011 WL 1239783, at *2 (S.D.N.Y. March 28, 2011); Keating v. Town of Burke, 86 A.D.3d 660, 660-61, 927 N.Y.S.2d 411, 412-13 (3d Dep't 2011).  A landowner, in turn, "has a duty to maintain [its] premises in a reasonably safe condition taking into account all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk." Alnashmi v. Certified Analytical Group, Inc., 89 A.D.3d 10, 14, 929 N.Y.S.2d 620, 624 (2d Dep't 2011); accord Basso v. Miller, 40 N.Y.2d 233, 241, 386 N.Y.S.2d 564, 568 (1976).

B. Adverse Inference

The plaintiff argues that the court should draw an adverse inference on the basis of the defendants' destruction of the temporary flooring before it could be examined or introduced as evidence and on the basis of their failure to call as witnesses at trial the carpenters who actually fabricated the flooring. (Submission of Plaintiff Jacoba Cornelisse ("Pl. Memo.") at 4-6). Presumably, the inference to be drawn would be that such evidence would have supported the plaintiff's position that the platform was at least an inch in height. Because resolution of this issue could circumscribe the evidence to be considered, I will address it first.

1. Spoliation

"Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Orbit One Communications, Inc. v. Numerex Corp., 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (quoting Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 107 (2d Cir. 2001)); accord Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., 769 F. Supp. 2d 269, 288 (S.D.N.Y. 2011); Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010); Richard Green (Fine Paintings)

12

v. McClendon, 262 F.R.D. 284, 288 (S.D.N.Y. 2009).  Even absent an order requiring preservation, a court may impose discovery sanctions for spoliation pursuant to "its inherent power to manage its own affairs."  Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002); accord Cedar Petrochemicals, Inc., 769 F. Supp. 2d at 288; Richard Green (Fine Paintings), 262 F.R.D. at 288; In re NTL, Inc. Securities Litigation, 244 F.R.D. 179, 191 (S.D.N.Y. 2007).  "'The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.'"  Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("Zubulake V") (quoting Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)); see also Harkabi v. SanDisk Corp., 275 F.R.D. 414, 425 (S.D.N.Y. 2010).

Where a party seeks sanctions based on the spoliation of evidence, it must establish:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding, 306 F.3d at 107; accord ACORN (New York Association of Community Organizations for Reform Now) v. County of

13

<u>Nassau</u>, No. 05 CV 2301, 2009 WL 605859, at *2 (E.D.N.Y. March 9, 2009); <u>Richard Green (Fine Paintings)</u>, 262 F.R.D. at 289; <u>Treppel v. Biovail Corp.</u>, 249 F.R.D. 111, 120 (S.D.N.Y. 2008); <u>Zubulake V</u>, 229 F.R.D. at 430.

"[An] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation . . . for example when a party should have known that the evidence may be relevant to future litigation." <u>Kronisch v. United States</u>, 150 F.3d 112, 126 (2d Cir. 1998); <u>accord</u> <u>Fujitsu Ltd. v. Federal Express Corp.</u>, 247 F.3d 423, 436 (2d Cir. 2001). "Thus, the preservation requirement arises when a party reasonably anticipates litigation." <u>Orbit One Communications, Inc.</u>, 271 F.R.D. at 436 (internal quotation marks omitted); <u>accord</u> <u>Pension Committee</u>, 685 F. Supp. 2d at 466; <u>Treppel</u>, 249 F.R.D. at 118; <u>Zubulake v. UBS Warburg LLC</u>, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("<u>Zubulake IV</u>").

Here, the preservation obligation did not arise until after the Smithsonian had already dismantled the Ingo Maurer exhibit and disposed of the temporary flooring. The exhibit ended in January 2008, and there is no evidence that the Smithsonian retained the platform for any period after that. Yet the plaintiff did not file a notice of claim until March 24, 2008 (Exh. B), and there is no indication that she ever submitted a preservation letter to the Smithsonian. To be sure, the Smithsonian was aware of the accident

14

at the time that it happened and an accident report form was completed.  (Exh. A).  But the occurrence of an accident is insufficient by itself to create reasonable anticipation of litigation.[4]  See Robinson v. Winslow Township, Civ. No. 11-530, 2012 WL 113643, at *3 (D.N.J. Jan. 13, 2012) ("'To assume that litigation may ensue from any accident may not be unreasonable, but the concept that the mere occurrence of an accident constitutes anticipation of litigation has been soundly rejected . . . .'" (quoting American Home Assurance Co. v. United States, Civ. No. 09-258, 2009 WL 3245445, at *2 (D.N.J. Oct. 7, 2009))); Skrovig v. BSNF Railway Co., Civ. No. 10-4022, 2011 WL 2263789, at *3 (D.S.D. June 7, 2011); Lee v. Overbey, No. 08-2115, 2009 WL 4672148, at *3 (W.D. Ark. Dec. 3, 2009).[5]  In the absence of a duty to preserve, then, the loss of evidence cannot be the basis for any spoliation sanction.

   2. Missing Witnesses

   The plaintiff's argument that she is entitled to an adverse inference because the defendants did not call as witnesses the

---

   [4] Some accidents -- an aviation disaster, for example -- may by their nature create an expectation of litigation.  This is not such a circumstance.

   [5] Each of these cases deals with anticipation of litigation in the context of attorney work product, not preservation.  The analysis, however, is essentially the same.  See Siani v. State University of New York at Farmingdale, No. 09 CV 407, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010).

carpenters who constructed the platform fares no better.  A finder
of fact may "'draw an adverse inference against a party failing to
call a witness when the witness's testimony would be material and
the witness is peculiarly within the control of that party.'"
Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d
409, 432 n.10 (2d Cir. 1999) (quoting United States v. Caccia, 122
F.3d 136, 138 (2d Cir. 1997)).  But no inference is warranted where
the party seeking it could have secured the witness' presence at
trial by subpoena but failed to do so.  See Turley v. City of New
York, 988 F. Supp. 675, 680-81 (S.D.N.Y. 1997), aff'd in part and
rev'd in part on other grounds, 167 F.3d 757 (2d Cir. 1999).  That
is the case here.  There is no evidence that Ms. Cornelisse could
not have subpoenaed the carpenters; she simply did not attempt to
do so.

     Accordingly, no inference will be drawn against the defendants
for the destruction of the temporary flooring or for the failure to
call the carpenters as witnesses at trial.

     B. Tripping Hazard

     The parties agree that the relevant regulations require a
change of elevation of up to 1/2 inch to be beveled over the upper
1/4 inch at a rise-to-run ratio of one-to-two, while a change of
elevation over 1/2 inch must be ramped.  (Tr. at 229-30, 251-52,
445-46; Exh. P at 39-40 (Smithsonian Guidelines for Accessible

Exhibition Design); 36 C.F.R. Part 1191, App. D (Americans with Disabilities Act Accessibility Guidelines); ANSI Standard A117.1-2003, § 303 ("Specifications for Making Buildings and Facilities Accessible to and Usable by Physically Handicapped People"); ASTM F1637, § 52 ("Standard Practice for Safe Walking Surfaces")). The initial question, then, is how high the temporary flooring was in this case. I do not credit the testimony of the plaintiff's witnesses that the change in level was an inch or more. These were casual estimates made primarily by interested witnesses including Ms. Cornelisse and members of her family. Nor was the testimony of the plaintiff's expert, Dr. Marletta, convincing. He based his estimate of the height of the platform on a photograph, yet he has no training in photogrammetry, the science of taking measurements from a photo. (Tr. at 243-44). Far more persuasive was the testimony of the Smithsonian's witnesses who described the process for planning and constructing the raised flooring. The plans called for a platform 1/2 inch high, and there is little doubt that Mr. O'Connor, who supervised the construction, would have recognized a significant deviation.

At the same time, I am not convinced that the platform was exactly 1/2 inch in height when completed. Mr. O'Connor testified that he used 1/2 inch MDF topped with a laminate that was 0.02 inches thick. And, while he represented that MDF is generally

17

undersized, he did not state that he had actually determined that the MDF used in this instance was less than 1/2 inch.  Accordingly, it is most likely that the change in level was approximately 0.52 inches.[6]

The critical legal issue, then, is the significance of this deviation.  Under New York law, violation of a local building code is some evidence of negligence, but it is not determinative; it does not constitute negligence per se.[7]  See Miller v. Astucci U.S. Ltd., No. 04 Civ. 2201, 2007 WL 102092, at *5 (S.D.N.Y. Jan. 16, 2007); In re September 11 Property Damage and Business Loss Litigation, 468 F. Supp. 2d 508, 522 (S.D.N.Y. 2006); Elliott v. City of New York, 95 N.Y.2d 730, 735-36, 724 N.Y.S.2d 397, 399-401 (2001); Gonzalez v. State of New York, 60 A.D.3d 1193, 1194, 875 N.Y.S.2d 327, 329 (3d Dep't 2009); Brigandi v. Piechowicz, 13 A.D.3d 1105, 1105, 787 N.Y.S.2d 790, 791 (4th Dep't 2004). Similarly, the requirements of the Americans with Disabilities Act

---

[6] On cross-examination, Mr. O'Connor was asked to assume that the MDF was 0.51 inches thick, so that, with the laminate, the total height would have been 0.53 inches.  (Tr. at 420-22).  But, while the plans indicated a total thickness of 1.3 centimeters, or 0.51 inches, standard size MDF would have been 0.50 inches, since it would presumably have been manufactured according to the imperial scale, not the metric scale, for sale in the United States.

[7] This is not to suggest that the New York City Building Code is binding on the Smithsonian, a proposition that the defendants hotly contest.

do not displace traditional common law principles in New York.  See
Lettera v. Retail Property Trust, No. 04 CV 4955, 2006 WL 196975,
at *5 (E.D.N.Y. Jan. 24, 2006); Lugo v. St. Nicholas Associates, 18
A.D.3d 341, 342, 795 N.Y.S.2d 227, 229 (1st Dep't 2005).

     Furthermore, where a regulation represents a good and safe
practice, a trivial departure from its requirements is not
actionable as negligence.  See Tincere v. County of Suffolk, 90
N.Y.2d 976, 976, 665 N.Y.S.2d 615, 616 (1997) (holding that
injuries resulting from trivial defects not actionable); Morales v.
Riverbay Corp., 226 A.D.2d 271, 271, 641 N.Y.S.2d 276, 277 (1st
Dep't 1996) (holding one-inch level difference in sidewalk,
standing alone, not actionable).  Here, a departure of two-
hundredths of an inch from the accepted standards was plainly de
minimis: it in no way made the difference between a safe transition
and a hazardous one.

     C. Lighting

     Of course, the walking surface cannot be considered in
isolation.  The plaintiff argues that the lighting in the area of
the accident was inadequate, and that it could have rendered
dangerous an otherwise safe change in level.  The evidence,
however, is to the contrary.  The subjective characterization by
Ms. Cornelisse and her husband of the area as "dark" is of little
probative value.  Their daughter's photograph, while somewhat more

objective, was obtained under uncertain conditions, as she could provide little information about her camera or the settings she might have used.  While Dr. Marletta took light meter readings, he did so in a haphazard manner and in a completely different exhibit that had its own unique illumination.  His conclusions about the lighting must therefore be discounted entirely.

The best evidence of the lighting conditions in the Ingo Maurer exhibit is the photograph taken by Thomas Vack, a professional photographer.  (Exh. D; Tr. at 318-19).  Mr. Vack took the photo the night before the exhibit opened, without a flash, and did not retouch the image.  (Tr. at 320-21, 324).  Mr. Vack did not adjust the lighting in any way when shooting the picture (Tr. at 321-22), and he confirmed that the photo accurately reflects the level of light in the exhibition at the time (Tr. at 324).  This evidence is compelling: the photo shows an area sufficiently well lit for a person exercising reasonable care to negotiate the change in levels safely.

D. <u>Warnings</u>

Finally, Ms. Cornelisse contends that the temporary flooring was hazardous because the change in level was not highlighted by a contrasting edge or by a warning sign.  However, the duty to warn applies only to "'a dangerous condition that is not observable with the reasonable use of one's senses.'"  <u>Clunis v. New York City</u>

Transit Authority, No. 10 CV 6063, 2011 WL 5825787, at *1 (E.D.N.Y.

Nov. 17, 2011) (quoting DiVietro v. Gould Palisades Corp., 4 A.D.3d

324, 325, 771 N.Y.S.2d 527, 529 (2d Dep't 2004)).  Since, as

discussed above, the platform was not hazardous in the first place,

there was no need for signs or other forms of warning.  Moreover,

the photograph shows that the raised flooring with the metallic

laminate contrasted sharply in color with the permanent floor, so

that the transition was evident, even if the beveled edge was not

a different color.  (Exh. D).

Conclusion

      Based on the evidence presented at trial, the plaintiff failed

to carry her burden of demonstrating that she was injured as a

consequence of a hazardous condition for which the defendants were

responsible.  Accordingly, the Clerk of Court shall enter judgment

for the defendants and close this case.

                    SO ORDERED.

                    _James C. Francis IV_
                    JAMES C. FRANCIS IV
                    UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       March 20, 2012

Copies mailed this date to:

Stuart M. Rissoff, Esq.
200 Garden City Plaza, Suite 144
Garden City, NY 11530

                              21

Kirti Vaidya Reddy, Esq.
Jeannette Vargas, Esq.
Assistant United States Attorneys
86 Chambers Street, 3d Floor
New York, NY 10007